GREGOR KLURFELD, Respondent, and BRIAN T. DEL GIORGIO, Individually and on Behalf of All Others Similarly Situated, Appellant, v EQUITY ENTERPRISES, INC., et al., Respondents. BRIAN T. DEL GIORGIO et al., Objecting Shareholders-Appellants.

Second Department, February 17, 1981

APPEARANCES OF COUNSEL

*Lumbard & Phelan, P. C. (Eliot H. Lumbard, John J. Phelan, III* and *Alvin Charles Katz* of counsel), for objecting shareholders-appellants and plaintiff-appellant.

*Kass, Goodkind, Wechsler & Labaton (Stuart D. Wechsler* of counsel; *Robert I. Harwood* on the brief), for defendants-respondents.

*Razis & Ross, P. C. (Stephen Ross* of counsel), for plaintiff-respondent.

OPINION OF THE COURT

HOPKINS, J. P.

The plaintiff Gregor Klurfeld, a shareholder of the defendant Equity Enterprises, Inc. (Equity), began this action on behalf of the minority public shareholders of Equity to enjoin the merger of Equity with the defendant New Equity Corp. (Newco). The theory of the action is that the proposed merger has for its sole purpose the elimination of the public shareholders and consequently constitutes a breach of the obligations owing to them by the defendants Gross and Moelis, who are at once the con-

trolling shareholders, the sole directors and the principal officers of Equity.

During the course of the litigation settlement negotiations were entered into by the parties, and as a result, a stipulation of settlement was reached. Special Term directed that the action should be conditionally maintained as a class action, that a hearing should be held for the purpose of considering the settlement, and that notice of the hearing should be mailed to the shareholders.

At the hearing the appellants, who are among the minority shareholders, objected to the settlement and moved to replace the plaintiff in the action with the appellant Del Giorgio. During the hearing the stipulation of settlement was amended so as to increase the price payable to the minority shareholders. Special Term permitted Del Giorgio to become a plaintiff in the action, but denied the motion to replace the plaintiff Klurfeld. Special Term, evincing doubts as to "the equity and justice" of the settlement, determined that the settlement should be approved.

Del Giorgio, now a plaintiff, and the objecting shareholders appeal, urging that the likelihood of success in the litigation in favor of the plaintiffs predominated, and that the settlement terms were unfair to the minority shareholders and should have therefore been disaffirmed.

We reverse and direct a new hearing. Special Term in the circumstances of this case should apply the standards of an appraisal proceeding in evaluating the reasonableness of the offer, and may, if so advised, employ the services of an independent expert to assist the court in determining the value of the minority shares, consistent with the procedure outlined herein, and, in the light of its finding with respect to reasonableness, either approve or disapprove the settlement.

## I

Equity is a Delaware corporation, organized in 1968; at that time it acquired the outstanding stock of three corporations then in business. Gross and Moelis held between them the stock control of Equity. Equity's operations consisted in the leasing of machinery and equipment for the specific

requirements of industrial and commercial consumers; in addition, Equity sold, repaired and rebuilt office machinery.

In 1969 Equity went public: 150,000 shares, a minority of the stock, were offered for purchase at the price of $5.50 a share. Gross and Moelis retained between them the stock control of Equity. As the result of the public offering, Equity realized about $732,500 from the sale. Among the purchasers of the stock were the plaintiff Del Giorgio (13,000 shares distributed between himself and a family corporation) and the appellant Cone (22,950 shares).

For a period after 1969 the market price of the stock rose to more than $5.50, but later it fell to $1 or less a share. Equity has declared no dividends, although it has consistently had profitable years. Through the span of 1969-1979, the book value of the stock as shown in Equity's financial reports has increased from $1.17 a share to an estimated $6.25 a share.

The plaintiff Klurfeld purchased 300 shares at $1 a share at a time subsequent to the original offering.

In 1979 a merger proposal was presented to the shareholders of Equity. In short, the proposal contemplated the merger of Equity and Newco, a newly formed Delaware corporation, and the elimination of the public minority stockholders by the payment of $2 for each share owned by them. Gross and Moelis by the terms of the proposal intended to transfer the majority interest of the 282,600 shares of Equity owned by them to Newco in consideration for all the stock of Newco. As the result of the merger Equity would become the surviving corporation, recapitalized so as to issue 1,000 shares of common stock, all of which would be issued to Gross and Moelis for their Newco stock. Hence, by the proposal Gross and Moelis would constitute the sole stockholders of Equity.

Prior to a scheduled stockholders' meeting in August, 1979 the plaintiff Klurfeld commenced this class action, simultaneously moving for a temporary injunction restraining the holding of the stockholders' meeting on the ground that the merger proposal, having as its sole object the elimination of the public stockholders and the dilution of their interests, was a violation of the fiduciary duties owed to the

public stockholders by the defendants. The defendants cross-moved to dismiss the action. At the argument before Special Term, both motions were withdrawn, and negotiations thereafter ripened into a settlement between the plaintiff Klurfeld and the defendants, whereby it was agreed that the amount of $2 payable for each public share would be augmented to $2.50 per share; the other terms of the original proposal remained substantially the same.

When the amended merger proposal finally came before the stockholders' meeting, it was approved, the shares owned by Gross and Moelis providing an overwhelming majority vote. Del Giorgio indicated that he would pursue his right to an appraisal (cf. Business Corporation Law, § 623); Cone abstained from voting.

Subsequent to the stockholders' meeting, a formal stipulation of settlement of the class action was executed, based on the amended merger proposal. When the stipulation was presented for approval after notice to the shareholders, Special Term, on consent of the parties, directed (1) that the action be conditionally maintained as a class action "for the sole purpose of effecting the Settlement by the named plaintiff therein as class representative and by his counsel as class counsel", (2) that a hearing be held to determine whether the terms of the settlement were "fair, reasonable and adequate", and (3) that notice of the hearing be given to the shareholders.

Del Giorgio and Cone then appeared in the proceedings and objected to the approval of the stipulation of settlement. Testimony as to the propriety of the terms of the stipulation was received at the hearing from the parties at Special Term.

## II

The evidence submitted by the respondents in support of the stipulation was principally adduced by the respondents Gross and Moelis. Frank Abella, a registered investment adviser and portfolio manager, retained to evaluate the stock, testified that the price of $2.50 per share was fair and reasonable. His conclusion was reached, as he testified, on the basis of 20 different measures of value, including the

amount and nature of the assets and liabilities of Equity, the earning power of the assets, the dividend history, the character of the corporate business, the market price over the years, and projections of future income. He considered of prime importance the "basic inputs" of earnings, market trading, and book value. Though the book value was $6.20 a share, he discounted it to $5.80 by subtracting the good will account. Attaching weights of 70% to market value, 10% to earnings, and 20% to book value, Abella found $2.50 per share to be a reasonable value of the stock.

Del Giorgio was called by the respondents ostensibly to establish that he had waived his right to object to the settlement by asking for an appraisal. However, on cross-examination by counsel for Klurfeld, he testified that the offer was in his view inadequate, because in the period between 1969-1979 the corporation had received an accrued benefit of $1,218,000 in stockholders' equity. In his opinion the stock was worth between $8 and $10 a share.

Moelis testified that in his opinion the original offer of $2 a share was fair. He disputed the equity value to which Del Giorgio testified, claiming that it was inaccurate to accumulate earnings over a 10-year period. His testimony placed paramount emphasis on market value, not book value. He further testified that the leasing business in which Equity engaged was at high risk, because of the current high interest rates as the result of which the corporation had withdrawn from its leasing operations and was investing its available cash in marketable securities.

Klurfeld testified that he believed that the settlement was fair, because the stockholders would be receiving about 40% of book value, in contrast to the shareholders of other corporations whose stock was trading for lesser percentages of book value.

Special Term during the hearing had manifested doubts concerning the fairness of the stipulation, noting that the majority stockholders would be receiving the benefit of the minority shareholders' investment, yet the minority shareholders would be obtaining only 25/55% of their investment in the face of a record establishing that no dividends had ever been paid though the corporation had consistently

shown a profit. Whether in response to the expression of those doubts or not, the settlement figure of $2.50 a share was raised to $2.60 a share by the defendants during the hearing.

Special Term in its decision, though still entertaining doubts as to the adequacy of the price to be paid for the minority stock, nevertheless, held that the only testimony concerning the value of the stock worthy of consideration came from Abella. At the same time the court expressed the belief that Abella's judgment had been influenced by the offer already made for the stock, and that Abella's assignment of 20% as the weight to be accorded to book value was low. Finally the court said: "The Court confesses at this time if the Court had to put an accurate value on this stock that without much more thorough study of all the financial records and of all the testimony and of all the papers, the Court just wouldn't know what figure to put on it," and that "The Court wants to stress the fact for the Appellate record that it has many doubts about the equity and justice of this settlement offer but on the testimony and the record before the Court the Court is reluctantly approving of the offer as amended to $2.60 in the hopes that the objectants will file an appeal and get this equitable question before the Appellate Courts where under this unusual situation I think it should be decided."

## III

In essence, the appellants urge two positions for reversal. Their first claim addresses the status of a class action and divides into two related arguments. First, they contend that Klurfeld does not fairly represent the interests of the appellants, because of the small number of shares owned by him and purchased at a price much lower than paid by the appellants. Second, they contend that the class was not given appropriate notice of the increased price of $2.60 per share offered by the defendants during the hearing.

The second position urged by the appellants poses the fairness of the settlement tested by standards which they claim apply, rendering the price of $2.60 per share inadequate and unreasonable. The summation of this argument

is that the proposed merger serves no business purpose of the corporation and in effect is designed to eliminate the minority stock interests for a consideration far below book value, resulting in an undeserved windfall for the benefit of the majority stockholders who are at the same time the managers of the corporation.

We consider these positions separately.

## IV

■ The statute grants wide discretion to the court in determining the feasibility and propriety of a class action *(Matter of Shook v Lavine*, 49 AD2d 238, 243). We think that the prerequisites of a class action are met in this stockholders' representative action (see CPLR 901); indeed, in a general sense an action of this character is a prototype of a class action *(Dresdner v Goldman Sachs Trading Corp.*, 240 App Div 242, 244; cf. *Nolen v Shaw-Walker Co.*, 449 F2d 506).

The appellants' main thrust is that Klurfeld's stock interest, measured by the price paid by him and by the number of shares owned by him does not satisfy the typicality requirement (CPLR 901, subd a, par 3). Klurfeld paid $1 a share in the market. Del Giorgio paid $5.50 per share at the time of the original offering; Cone paid no cash, but received his shares for another company's shares at the time of the offering; the record does not evince the price paid by other objecting stockholders at the time of the acquisition of their shares.

We do not consider that a difference in price paid by stockholders for their share per se rules out the exercise of the court's discretion in certifying a class action. This is not a case where the plaintiff's claim is nontypical because his claim is time barred, but other parties' claims are not *(Ross v Amrep Corp.*, 57 AD2d 99, 101, app dsmd 42 NY2d 910). Though the amount of their interests may vary between shareholders, this variance is not distinguishable from the differences in damages sought to be recovered by individual claimants in a class action (cf. *Vickers v Home Fed. Sav. & Loan Assn. of East Rochester*, 56 AD2d 62). In substance, Klurfeld's claim that the proposed merger

violates the rights of the minority shareholders is integral to each share of stock, regardless of the price paid for the stock.

No more do we consider that Klurfeld's comparatively few number of shares vis-à-vis the shares owned by Del Giorgio or Cone renders a class action improper. The claim of illegality advanced by Klurfeld in the action affects all shares of stock to the same degree and for the same reason —that is, the characteristic of an identity of claim with other stockholders inheres in Klurfeld's posture (see 2 Weinstein-Korn-Miller, NY Civ Prac, par 901.09). The financial stakes for Del Giorgio and Cone may be higher as compared to Klurfeld, but the essential legal claims asserted against the defendants do not materially differ.

It is true that Klurfeld's interest in proceeding with the litigation might well be affected by the ultimate gain to him. The appellants do in fact imply that Klurfeld did not bargain as strongly or shrewdly as he should have in arriving at the settlement. However, this deduction, if accurate, is more pertinent to the fairness of the settlement than to the propriety of the class action as a means to resolve the issues.[1]

We hold, therefore, that Special Term did not improperly exercise its discretion in certifying a class action. We turn then to the question whether notice of the increase in price offered during the hearing ought to have been given to the shareholders.

The appellants contend that the sole notice given to the shareholders reported the offer of $2.50 per share, and that the failure of Special Term to order further notice relating to the offer of $2.60 a share made during the hearing precludes approval by the court of the settlement based on the latter figure. We observe that the manner and circumstances of giving notice are clearly within the discretion of the court (CPLR 904, 907, 908), a power akin to that vested in the Federal courts (see Ann. 30 ALR Fed 846). Special Term based its refusal to require a second

---

1. We are aware of CPLR 906, permitting the division of classes into subclasses. Nevertheless, we think this provision more aptly relates to the fairness of the settlement.

notice on the ground that the shareholders had already been notified of the offer of $2.50 a share, that the objecting shareholders had accordingly appeared, and that it was safe to assume that a mere increase of 10¢ a share would not produce more objectors. We cannot say that Special Term's decision was improvident.

The only justification for a second notice might be that a shareholder, on learning that a larger offer had been made during the hearing, would speculate that the court had indicated that the first offer was inadequate, and that it was to the advantage of the shareholder that he now make an appearance in the hearing to protect his interest. But this is speculation, and we are not impressed that the insubstantial sum of the increase would necessarily prod a somnolent shareholder into wakefulness.

We conclude, therefore, that Special Term's discretion in dealing with the procedural aspects of the class action was not improvidently exercised.

## V

The fairness of the settlement presents more troublesome issues. A class action may not be compromised without the approval of the court (CPLR 908). Though the court's approval is not conditioned by the statute on prescribed guidelines, case law suggests the components which should be considered in reviewing a settlement: the likelihood of success, the extent of support from the parties, the judgment of counsel, the presence of bargaining in good faith, and the nature of the issues of law and fact (State of West Virginia v Pfizer & Co., 314 F Supp 710, 740, affd 440 F2d 1079, cert den sub nom. Cotler Drugs v Pfizer & Co., 404 US 871). We should not expect the application of these factors to follow a formulistic approach; rather, it is the circumstance of the case itself which should mold the approach of the court in deciding the weight to be accorded to each of the components. Since the principles of law and the nature of the facts involved in the case occupy such prominence in the tests suggested, we ought first to delineate the relationship between the parties as shareholders in Equity.

The balance between the tyranny of majority shareholders and the selfish recalcitrance of minority shareholders in corporate mergers has been struck by the statute by permitting the majority to secure a merger and the minority to secure the appraised fair value of their stock *(Beloff v Consolidated Edison Co. of N.Y.,* 300 NY 11). Even so, fiduciary relation of the majority to the minority *(Kavanaugh v Kavanaugh Knitting Co.,* 226 NY 185, 193) persists, and the power of the majority in proposing the terms of the merger must be exerted according to the principles applicable to a fiduciary *(Pepper v Litton,* 308 US 295, 311; *Southern Pacific Co. v Bogert,* 250 US 483, 487-488). Controlling shareholders who participate in the formation of corporate policy and the making of management decisions are particularly within the fiduciary regimen *(Kavanaugh v Kavanaugh Knitting Co., supra,* pp 194-196).

The mechanism opted by the majority stockholders here amounts to a freezeout of the public stockholders, that is, a forced liquidation or sale of the minority shareholders' stock incident to a merger (Vorenberg, Exclusiveness of the Dissenting Stockholder's Appraisal Right, 77 Harv L Rev 1189, 1192-1193). Obviously, in a freezeout, the majority is treated differently from the minority in that the majority will retain their equity, yet compel the minority to accept cash (Brudney & Chirelstein, A Restatement of Corporate Freezeouts, 87 Yale LJ 1354, 1358). In this instance, the merger of the principal corporation (Equity) is with a corporation (Newco) newly formed by the majority for the sole purpose of the merger, since Newco will disappear after the merger is effected.[2]

Under these circumstances, we think that the strict scrutiny test of the discharge of a fiduciary duty must apply (see *Chelrob, Inc. v Barrett,* 293 NY 442, 461). This view concurs with the recent trend treating a freezeout arising out of a merger of the principal corporation with a newly created corporation owned by the majority stockholders

---

2. We point out that this is not the case of a freezeout occurring as the result of a merger of a parent and affiliated corporations (cf. Brudney & Chirelstein, Fair Shares in Corporate Mergers and Takeovers, 88 Harv L Rev 297, 313 ff).

(see, e.g., *Berkowitz v Power/Mate Corp.*, 135 NJ Super 36; *Singer v Magnavox Co.*, 380 A2d 969 [Supreme Ct, Del]; *Gabhart v Gabhart*, 267 Ind 370). Sometimes the propriety of the merger is said to hinge on whether any corporate purpose other than forcing out the minority will be served by the merger. We think that this is a legitimate inquiry but only a part; and that the larger inquiry is whether the conditions of the merger as a whole compelling a liquidation of the minority interest are fair to all concerned. We revert to the terms and effect of the settlement here in the light of this conception of the rights of the parties.

█ The respondents argue preliminarily that the appellant Del Giorgio by seeking initially an appraisal of his stock waived any question pertaining to the settlement. It is settled, however, that an appraisal is not the exclusive remedy of a stockholder when at the same time fraud or illegality is claimed *(Matter of Willcox v Stern*, 18 NY2d 195, 204).

█ Turning to the components of the test suggested in *State of West Virginia v Pfizer & Co.* (314 F Supp 710, 740, affd 440 F2d 1079, cert den *sub nom. Cotler Drugs v Pfizer & Co.*, 404 US 871, *supra)*, we consider that the overriding concern of the propriety of the settlement here is whether the price offered approaches the fair value of the stock measured in relation to the probable success of the action. That is to say, the greater the probability of success, the closer to the fair value of the stock should be the price offered. Or to put it differently, we should expect that the price offered on the settlement should be not too far below the fair value of the stock fixed as the result of an appraisal proceeding, given a strong probability of success in the class action.

Hence, on this aspect of the case, the other components of the test described in *West Virginia (supra)* are less significant. The plaintiff's support of the settlement cannot be viewed of large weight, comparing the small number of shares owned by him with the much greater concentration of shares owned by the appellants. Thus, assuming the exercise of good judgment by plaintiff's counsel and the

existence of good faith bargaining by both parties to the settlement, the requirement of strict scrutiny of the settlement depresses the importance of those considerations, if we conclude that the settlement does not treat the minority stockholders fairly. Finally, we note that the nature of the legal and factual issues is inextricably caught up in the application of the general concept of fairness in the dealings between the majority and minority stockholders.

We do not deprecate the worth of a settlement in class actions or stockholders' suits. All lawsuits, more or less, present the risk of defeat, and perhaps stockholders' representative actions the more; and certainly it is true that settlements are to be encouraged. Nonetheless, in fairness to minority interests, we must judge the fairness after settlement in part, at least, by the merits of the action. The merger here is not justified by any material advantage to Equity. Newco brings with it no present business inducements or other benefits. The effect of the merger appears to affect only the minority stockholders by erasing their further participation in the affairs of Equity. It is said by the respondents who are in control and have managed Equity's business since its inception that Equity cannot borrow fresh money unless Moelis and Gross supply their personal guarantees for the repayment of the loans, and they are not willing to risk their individual fortunes for that purpose. Though this may be a legitimate personal concern, it is not a true corporate concern. Though, too, the respondents stress the strains which other corporations in the same business as Equity are now experiencing, the fact is that the record of Equity is that it has operated profitably and that by the merger Equity is intended to continue to operate.

The question, then, is narrowed to whether the proof presented by the respondents at the hearing established the fairness of the offer of $2.60 a share under the circumstances of the case. That proof rests on the expert testimony of Abella. Our examination of his testimony leads to difficulties and uncertainties—a result to which Special Term subscribed in the frank expression of its doubts.

First, we observe that the value found by Abella was

not preceded by the analysis usually employed in the appraisal process (see, e.g., Ann. 48 ALR3d 430). It is not enough that lip service be paid to the three factors attending the estimate of fair value under the appraisal statute (Business Corporation Law, § 623): net asset value, investment value, and market value *(Matter of Endicott Johnson Corp. v Bade,* 37 NY2d 585, 587; cf. *Matter of Abelow v French Investing Co.,* 17 AD2d 794, affd 13 NY2d 812; 3 White, New York Corporations [Kantrowitz & Slutsky, 13th ed], § 623.07 ff, pp 6-594.1—6-594.3); the opinion of the expert should reflect the application of these factors based on the facts of the case. The character of Abella's testimony appears in the following excerpt:

"Given all of this, this then becomes a part that enters into the weighing that one could apply.

"In my experience, courts and security analysts are paying more attention to the market test than they are to the book value test. This probably accounts for the great number of companies even listed on the New York Stock Exchange that today sell at six times earnings or less, yield six percent or more, and are selling at 16 percent of their book values, and I mean some very fine names in that population.

"So that the test of trying to put a component weighting on each one of the individual tests, marketability, the book value and the earnings test, becomes something which now the judgment factors come into. In doing this, I arrived at a range and I have the calculations here to support all this, if you are interested further, and maybe there will be some questions on it, but the range that this company would be considered properly valued from an appraisal point of view, and when the $2.50 offer was placed in this range, it was my opinion that it was fair and reasonable to both the stockholders and to the corporation to have the $2.50 price as a fair price."

It is plain that the process of coming to an estimate of value through the use of these factors is regulated in final conclusion by the weight which is assigned to each of the factors by the expert. Here Abella gave overwhelming weight (70%) to market value. By his analysis, earnings

(10%) and book value (20%) were effectively discounted to virtually little weight. No explanation for this choice was vouchsafed by Abella, save his statement that "[i]n my experience, court and security analysts are paying more attention to the market test than they are to the book value test." On the other hand, under cross-examination he admitted that Equity's stock was thinly traded, and no market in a true sense existed.

We think that where Equity has consistently shown a profit, and book value by Abella's own estimate is $5.80 a share, the weight of 70% assigned by him to market value unfairly inflated that factor to the detriment of the other factors. Though we express no view with respect to the proper percentage to be allocated to the three factors, we reach the conclusion that the weight of 70% given to the market value resulted in an unfair and distorted value of the shares, so much so that the case should be remanded to Special Term for a further hearing. At that hearing, since we find that under the circumstances present here the settlement figure must be close to fair value, the determination of a fair offer for the stock should be judged by the same process ordinarily in effect under a statutory appraisal.

## VI

We recognize that the resolution of the fairness of the settlement dependent on the propriety of the price offered for the liquidation of the shares implicates numerous and complex subordinate questions pertaining to accounting and valuation practices. The court, if it be so advised, may desire to appoint an expert to assist it in arriving at a decision. Though court-appointed experts in all cases may not be authorized (cf. *International Fastener Co. v Francis Mfg. Co.*, 204 App Div 526, affd 236 NY 673), we think that the breadth of the discretion resting in the court to make appropriate orders in the course of the conduct of class actions (CPLR 907, 908) envelops an order by the court appointing a disinterested expert to assist it by examining the books of Equity and other pertinent records and to report his findings on the fair value of the shares (see 2 Weinstein-Korn-Miller, NY Civ Prac, pars 907.01-

907.08, 908.01-908.02; McLaughlin, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C907:1, C908:1, pp 346, 347; see, especially, the helpful review in Developments in the Law—Class Actions, 89 Harv L Rev 1318, 1568-1576).

If the court should appoint an expert, the order should also provide that his report should be served on all parties prior to the hearing, that any party or the court may introduce the report into evidence at the hearing and that any party would be entitled to examine the expert as a witness at the hearing, without being bound by the expert's testimony.[3] The order should also provide for the payment of the expert's fees and may provide that the expense may be charged as costs against the corporation or any party to the action, as part of the ultimate judgment.

We emphasize, however, that we do not direct the appointment of an expert and leave the decision of whether such an appointment should be made to the discretion of Special Term.

## VII

The order and judgment should be modified accordingly and a new hearing held consistent with this opinion.

DAMIANI, LAZER and COHALAN, JJ., concur.

Order and judgment (one paper) of the Supreme Court, Westchester County, dated March 10, 1980, modified, on the law, by deleting therefrom the provisions approving the settlement. As so modified, order and judgment affirmed insofar as appealed from, without costs or disbursements, and case remitted to the Supreme Court, Westchester County, for further proceedings consistent with the opinion herein.

---

3. It should be noted that the court is authorized to appoint an appraiser in an appraisal proceeding (Business Corporation Law, § 623).